Honorable the judges of the United States Court of Appeals for the 4th Circuit. Our final case of the day is number 1965 23 Burke v. Clarke. Mr. Harald. Good morning plaintiff. Yes your honor good morning. It's great to be with you virtually your honor. And may it please the court Daniel Scott Harald on behalf the appellant Randy Burke. I'd like to reserve five minutes for rebuttal. Your honors Randy Burke was forced to live in quasi solitary confinement for over four years simply because he would not cut his hair as that would violate his religion. Virginia Department of Corrections grooming policy and its confinement of Mr. Burke in the admittedly punitive violators housing unit placed a substantial burden on Mr. Burke's religious practice in violation of the Lupa and the First Amendment. On appeal VDOC doesn't challenge the idea that the grooming policy and the VHU placed a substantial burden on Mr. Burke's religious practice and therefore they forfeit any argument in response. Instead VDOC argues that Mr. Burke didn't raise this claim below but that's just thoroughly belied by the record. So I'd point this court to JA 18 paragraph 36 of the complaint where Mr. Burke specifically states that his placement in the VHU violated his First Amendment Lupa and Equal Protection Clause right. I'd point this court to JA 23 paragraph 61 of his complaint where Mr. Burke specifically stated that the grooming policy punished him for his religious belief in violation of the First Amendment Lupa and Equal Protection Clause right. And then on JA 24 in his for release Mr. Burke specifically requested a declaration that the application of the grooming policy as to him violated his religious rights in violation of the Lupa First Amendment and the Equal Protection Clause. Yes sir. So you pointed out in three separate instances in a complaint where he clearly alleged a violation of the grooming policy but I understood the Commonwealth's argument to be that your client failed to exhaust his administrative remedies because he didn't mention the grooming policy when he filed with informal complaints or regular grievances at least not the first set and that that works a waiver because of the failure to exhaust. So can you address that? Your Honor I think my reading of VDOC's brief is that it's not an exhaustion of administrative remedies in the prison that VDOC is rather it's an argument that Mr. Burke did not present this argument to the district court and in fact if you look at VDOC's brief they say that because the magistrate judge didn't expressly address this argument that he must not have raised this argument in the district court. So I don't think VDOC actually raised an administrative exhaustion type of argument in regard to the Lupa and Burke. I thought they argued that Mr. Burke never made a challenge like this prior to the appeal and therefore he failed to preserve the argument. I thought that was in the response brief. Am I misreading that? I'm sorry, Your Honor. So the way I read the brief is that Virginia was arguing that he didn't raise this argument in the district court before he appealed his case to the district court. Not that he didn't raise this. Well okay, but he didn't raise it I suppose. That's sort of I think at least an argument that that's a jurisdictional question as a prerequisite to our considering it. Let's assume for the moment that their argument is much more expansive. Do you concede that the first time that this grooming policy argument appears is in the complaint? No, Your Honor. Not at all. I think if you look at the grievances which I'm turning to it now if you look at page 107 of the Joint Appendix. So most of his grievances are listed from pages 97 to 98, 99, 100 and he mentions the grooming policy numerous times throughout these grievances. He also mentions the religious policy which requires housing in the violators housing unit if you cannot comply with the grooming policy. So this is consistent throughout his grievances in the record and in fact the district court when ruling on Mr. Burke's or ruling on the defendant's summary judgment motion the district court never held that Mr. Burke failed to exhaust his administrative remedy. Rather the district court held that Mr. Burke that this grooming policy and the VHU did not place a substantial burden on Mr. Burke's religious practice. So I don't think it's the case that this argument was not presented to the prison and I think in fact Mr. Burke filed numerous grievances as VDOT admits regarding his housing in the VHU. He attaches numerous affidavits from other Rastafarian inmates who are housed in the VHU and how they're being punished for this. So this has always been the crux of Mr. Burke's claim from the very beginning on this case and the fact that Virginia didn't argue this administrative remedy exhaustion type argument in fact the district court didn't address this argument I think shows that this argument is properly exhausted and it was clearly raised in the district court below. And then the only other argument that VDOT makes in response to the First Amendment and Lalupa claim is that the claims are moot but that's clearly that doesn't apply to the First Amendment claim as that includes a request for damages but Virginia also can't satisfy its heavy burden of meeting mootness in this case and Porter v. Clark that when VDOT changes its policies during the course of litigation where nothing prevents VDOT from going back to that policy which is the case here that this court won't find mootness or won't find that VDOT met its burden of approving mootness and so I think given those clear precedents and their clear application here it's clear that this case isn't moot it's clear that Mr. Burke raised this argument in the district court and therefore this argument on its merit. So you say that it's clear that he raised the arguments below but the two separate judges that were reading the complaint and addressed the complaint in the decisions neither one specifically interpreted his claims as including an impossible choice argument is that correct? Well your honor I think Judge Kaiser's opinion is a little bit unclear on this on this point but Judge Kaiser does say that Mr. Burke has produced evidence of a substantial burden on his religious practice and Judge Kaiser in his opinion also discusses the VHU and how Mr. Burke is housed in the VHU because of his religious beliefs so I don't think the opinion is necessarily the most detailed as to that point I do think Judge Kaiser recognized the substantial burden point when it denied VDOT's initial motion for summary judgment. Now in the second motion for summary judgment the magistrate judge did not address this argument but that was in part because she found that a Mr. Burke's religious beliefs weren't sincere an argument that VDOT's refuge was suppressed now and then she said there just wasn't any kind of substantial burden on his exercise but I think what is most telling as to this point is that when this court requested briefing in this case it specifically acknowledged or asked for briefing on the question of whether this grooming policy and the VHU place a substantial burden on Mr. Burke's religious practice which is completely consistent with this court's statement that its goal is to discern the intent of the litigants and especially pro se litigants whose pleadings must be construed broadly and it's clear from all of Mr. Burke's he was saying he was being punished for his religious practice the punishment in question was his housing and VHU and all of the restrictions that flowed from it and so I do think despite the district court's holding I think a careful reading of Mr. Burke's pleadings or even a cursory reading of Mr. Burke's pleadings raises this argument squarely and this court recognized that when it Prior to you being assigned to the case by this court did Mr. Burke ever have counsel in this case? No your honor Mr. Burke never had counsel in the district court. He was pro se all the time up to you got in. You and your colleagues at the University of St. Louis. Yes your honor. Thank you. Thank you your honor and so and then I'd like to turn to the equal protection clause claim and explain why Mr. Burke why it was inappropriate for the magistrate judge to grant summary judgment on this claim especially after Judge Kaiser found that summary judgment was inappropriate. First turning to the grooming policy while the grooming policy is neutral on its face an application and had the effect of punishing rastafarian inmates for practicing their religious beliefs and we know and we've seen time and again that a neutral policy that targets a certain group of people can violate the equal protection clause and that's exactly what happened here and in fact Judge Kaiser and his opinion said that the VHU is reserved for inmates who refuse to cut their dreadlocks in violation of the religion. So Judge Kaiser understood the VHU as being home for rastafarians who couldn't comply with the grooming policy. If this court looks or takes notice of Greenhove Clark a prison official in that case said the VHU was reserved for rastafarians and then in an official VDOC policy paper a VDOC expressly notes that rastafarians must comply with the grooming policy despite the fact that numerous other religions could potentially be required to grow their hair or grow their beard in a way that would violate the policy so it's clear that VDOC was targeting rastafarians through the use of this grooming policy and their placement in the VHU and this kind of differential treatment is only confirmed by the fact that rastafarians just did not have the same opportunities to practice their religion as were getting to other inmates in that prison. So for example there were no religious implements that rastafarians could use despite the fact that VDOC had available all kinds of implements for all sorts of religions both that were donated but also that VDOC carried for sale and VDOC never housed or never carried any rastafarian items. So while we're at it, Judge Diaz, can I ask a question about the policies you just talked about that identify rastafarians as being impacted by the segregation policy. If that's the evidence you have with respect to intent which I guess you have to show for equal protection claim, isn't it more reasonable to read those policies as simply recognizing that the grooming policy had a discriminatory impact on rastafarians not necessarily that there was a discriminatory intent? Your Honor, I don't think so and that's for a couple of reasons. One is that the discriminatory impact operated just by the fact that the grooming policy was in existence period. But the fact that VDOC specifically targeted rastafarians on an official document saying that they in fact must follow the grooming policy shows that they intended for this grooming policy to at least strong evidence that they intended for this grooming policy to apply to rastafarians in ways that it did not apply for inmates of other religions. And then if you look at other aspects of the VDOC policy, so for example, JA361 which is VDOC operating procedure 84.1.3 which is the offender religious program document, it says that VDOC can restrict religious practice for failing to adhere to grooming requirements. And so the fact that VDOC knows that it is punishing people for not complying with the grooming policies and then on top of that, the fact that VDOC specifically targets rastafarians for compliance with the grooming policy, I think those two things together can give rise to an inference of discriminatory intent. And I think that's even more clear when you just look at the lack of resources available to rastafarians in the prison to practice a religion in comparison with other religions in that prison. And so that goes not only to religious implements, it also goes to religious faith services. It goes to religious holidays and what meals and special services are available. And at every turn, rastafarians receive less than many of the other religions in the prison and on this record, VDOC has not produced any justification for why it treated rastafarians so differently. And in fact, they only say that Mr. Burke never filled out the correct form which if you look at the request to attend religious services form, there is no ability to request a rastafarian religious service and because Mr. Burke was in the phase one of the DHU, he actually wasn't eligible to attend group religious services. VDOC says Mr. Burke did not fill out the right form to request religious items, but if you look at JA-31, he did fill out an offender request form requesting the item and VDOC never points to any other form that Mr. Burke should have filled out. And it's just, VDOC cannot say that Mr. Burke never made the prison aware of the fact that he was just trying to practice his religion and the fact that VDOC didn't have anything for rastafarians to practice their religion in this prison given all of the other implements it has and given the fact that it has a sizable rastafarian population, I think that this juncture should be enough to overcome summary judgment with regard to the question of intentional discrimination. And I see I'm coming up at the end of my 15 minutes, but I would just like to remind this court that Mr. Burke was literally placed in solitary confinement just because he wanted to practice his religion. And if this court looks at its decision in Porter v. Clark, where it discusses how death row inmates were housed in Virginia Department of Corrections facilities, the VHU operated exactly the same with the same kind of restrictions as death row. And that's all because Mr. Burke grew his hair in accordance with his religion. And as the district court initially found before the magistrate judge issued her opinion, this was a place of substantial burden on Mr. Burke's religious practice. And he also, summary judgment was also inappropriate on the Equal Protection Clause grounds. Thank you. Thank you, sir. We appreciate it. Ms. Samuels? Yes, Your Honor. You represent the defendants? Yes. Pleased to hear from you. Thank you. Thank you. Good morning, Your Honors. And may it please the court, Jessica Samuels for the Apple East. Mr. Burke's complaint in this case asserted two sets of claims that are before this court on appeal. One, violation of his rights to freely exercise his religious beliefs. And two, intentional discrimination in violation of the Equal Protection Clause. On the record presented below, the district court properly granted summary judgment on both sets of claims. This court should affirm that judgment for three reasons. First, the free exercise theory that counsel now presses on appeal was not raised below. Second, even if Mr. Burke had asserted a challenge to the grooming policy based on an impossible choice theory before the district court, that claim would now be moved. And third, the district court correctly concluded that the claims Mr. Burke did raise failed as a matter of law on the evidence presented. To begin with the free exercise claims, both the briefing and counsel's argument this morning make clear that the nature of these claims has shifted dramatically from what was before the district court. Throughout the proceedings below, Mr. Burke's pleadings consistently identified three ways in which he was allegedly not able to freely exercise his religious beliefs. One, group services, two, religious items, and three, holiday meals. Those are the issues that the department addressed in its summary judgment papers. And those are the issues that the district court addressed in its opinions. The grievances to which counsel points this morning were importantly, not the ones that Mr. Burke chose to attach to his complaint. And that's important, your honors, because a plaintiff is the master of his complaint, even if pro se. And of all the grievances that Mr. Burke submitted and then appealed, which are in the record as counsel noted, he chose certain of those grievances to attach to his complaint and to pursue in his federal court litigation. And the grievances... Samuel Garcia here. I just want to be clear. I asked your friend on the other side of this question, and it doesn't sound like you disagree with him, but this is not an appeal about exhaustion. It's an appeal about failing to plead in the district court. Is that right? That's correct, your honor. Okay. Go ahead. I think it's helpful to look at the complaint, uh, the way that my friend on the other side did this morning. Um, we can start at the very beginning, which is JA 11. This is the form that, uh, Mr. Burke filed to initiate his lawsuit, um, the complaint form. And he clearly lays out separate claims and his religious exercise claim says defendants violated my rights to Rastafarian religious services, service items, and religious Holy day meals. He's not challenging the grooming policy. He's not challenging the violators housing unit. He's asking for access to three different items, three different things. And for the reasons we've explained, and I'm happy to discuss with the impose a substantial burden on his free exercise of religion. As counsel notes, the point of the pro se standard is to discern the intent of a litigant and looking at this pleading is the best way to do that, your honors. And when you read through the pleading consistently, Mr. Burke is asking about services, items, and meals. That's the argument that the department addressed and it's a summary judgment papers. And that's the argument that both, both of the district, uh, the district court opinions considered. The timing here is also important, your honor, because the impossible choice theory that counsel now relies on. It wasn't new at the time. And it's not something that would have been foreign to the district court or to the department because it was being litigated in the Greenhill case at exactly the same time. When you look at the way the procedural histories of these cases lined up, the Greenhill decision, the second opinion in that case was in September of 2018. And the second opinion in this case was in March of 2019. And so the department was well aware of these arguments and the district. So I'm looking at, again, looking at the pro se complaint and you did correctly point out sort of the primary focus of the complaint, but King pointed out, uh, likely so that, uh, the plaintiff in this case was pro se up until the moment of this appeal. And so we, we do obviously take a pro se litigant and give him a fairly wide berth in terms of pleading and the life. I mean, he, and he does throughout this complaint sort of identify that he's complaining about the defendants, uh, and identifies the dependents in paragraphs four and five, who are responsible for, uh, uh, placing people in violator housing units for people who quote, refused to cut their hair because of Rastafarian religious beliefs. He does that at paragraph four. He doesn't begin in paragraph six and in paragraph 16 of the complaint, he says, uh, at rate red state and in prison, uh, I was placed in segregation for not being in compliance with the Virginia department corrections grooming standards because of my dreadlocks. And then in the legal claims, he talks about, um, uh, he identifies the legal claims. Isn't that, isn't that enough? I mean, we, we don't demand legal perfection of pro se litigants. It's clear that he's, he's, he's sprinkled this, this, uh, complaint throughout the, uh, throughout his pleading. Why isn't that enough? Well, your honor, I think that the most important thing here is to, to remember that the, the special solicitude with which we, uh, construe pro se pleadings, which of course the department doesn't challenge here, but, but it does have a limit. And the limit is to discern the intent of what a litigant was challenging. And so to say that there, that it was sprinkled throughout here enough. Um, I think the appropriate lens to look, look at that through is what he was asking for, and he was asking for services, items, and meals. And I think, um, J 23, uh, to which my friend on the other side points is a helpful way to look at that. Um, where the complaint notes that it does note the grooming policies, the operating procedure. But then he notes that the reason he's complaining about it is because it denies him access to group services, items, and meals. And so when you, when you read through the complaint, those are the things he's asking for. Um, and, and so I think that's the most helpful lens instead of, are there enough references here or there? I think it's also helpful on that same note, your honor, that this is not a complaint where it's not clear what he's challenging or what he's seeking or where it's ambiguous. And he invokes several different provisions and several different claims and the district court has to figure out what he's challenging. Um, the, the department brief summary judgment twice and the district court wrote two opinions and your honor to, to say now that the, the complaint adequately raised this claim. I think it would be fair to say that then the department and the district court just missed it. And so I think that that's a helpful understanding of what was and wasn't raised in terms of everyone who was looking at this pleading and trying to figure out and figure out what it says. Um, on the same, on that same note, your honor, even if you don't agree with me and you think that is enough. Um, I do think it's important to note that that grooming policy that the council has focused on this morning is no longer in effect. And so any injunctive claims on that would be moved. So to the extent this court, um, is inclined to find that the, the grooming policy was adequately raised below and to remand on that basis. Um, the, the prior policy that's been challenged, um, the claims on that would be moved. And so we would urge the court to at least, um, agree with us on the argument and, and send it back on a limited basis. But again, we, we don't concede that we think it's not raised and we don't think it's fair to this judge King, uh, your, your friend there on the other side says it's not. Uh, because you can change it back tomorrow the way it was before. Um, so we, we need to rule on it. He doesn't buy into your business claim. Yes, your honor. Uh, we have several responses to that. The first is that this change in policy was not just an overnight flip of the switch, um, and the department adopted an entirely new department wide policy. Um, that involves rigorous procedures, um, and it's not something that can change overnight. I think that's the first important fact on the mootness analysis. The second is that he's been moved out of the solitary confinement. Uh, he's been moved out of the violators housing unit. Yes. Your honor. He was in our four years cause he wouldn't comply with your mandate that he cut his hair. Correct. Yes, your honor. And y'all, you didn't challenge the proposition that the Rastafarian religion required him to leave his hair alone. That's correct. We have not challenged that. The new policy, however, was enacted in June of 2019, um, which that timing is important because that you can't draw a through line from this litigation. And Mr. Burke's claims, even assuming he's raised the grooming policy to the department's changing of its policy. And I think that's a very important fact for the voluntary cessation analysis. Um, another important fact is that the, the department in this briefing and before this court has expressly disclaimed any intent of changing the policy back to the old one. And so I think that also sets, sets this case and these circumstances apart from, from some of the court's precedent that counsel has cited this morning, where is that? I mean, you're saying it here today, but is that you said it's in the briefing and in the record, where is that? Yes. Your honor. It's, um, in our brief at page 33 and 34. So you are representing, I'm sorry, go ahead. Um, you're, you're, you're representing on behalf of the commonwealth of Virginia that you do not intend to revert back to this policy period. But your honor, we are representing that that defendants disclaim any intent of doing so. Well, I mean, sort of the language that's, uh, the, the, the, the principle of law that you have to abide by is that it has to be absolutely clear that this allegedly wrongful behavior won't be repeated, won't be expected to recur. And you're suggesting that because of the sort of the, uh, the time and effort it takes to reinstate, reinstitute the policy and the representations in the record and in the brief that that's, that's good enough. That satisfies that. That is our position, your honor. But I think there's, I think there's more. I think there are at least two other reasons that, um, we can be assured that that standard isn't met here. The first is that if you look at the history of the grooming policy, it has consistently become more lenient and allowed more, um, hairstyles and offender conduct, not less. It's not becoming, um, more restrictive. And that, I think that history is important and that history is important against the backdrop of the evolving legal landscape on these issues and the department's, um, good faith attempt to, to comply with that. And on that note, this court is well aware of the, the greenhill precedent that my friend on the other side has raised. And so to the, the extent that, that going back to the old policy would raise questions, at least under Ralupa. I think that's another, that, that potentially adverse precedent weighs in favor of the department here and weighs against the finding that there's any reason to believe the department is, is inclined to just flip a switch and go back to the old policy, um, particularly in light of the fact that, um, the Mr. Burke has not just been transferred out of the violators housing unit. Just him as, as might be alleged to try to evade liability on this one litigation, the whole unit has been, been shut down and abolished. And so it's not, this isn't like one of those cases where, um, it's easy enough to, to change something, to try to wait out a lawsuit and then be able to go back overnight. But those just aren't the circumstances here, given the context of the department wide policy and the evolution of that policy, when you say the unit's been shut down and abolished, you mean that this unit at what the Wallace Hills or something, the violators housing unit at Wallace Ridge. Yes, your honor. That, that was a grooming. Does it, do they have a unit at some other prison like this? There's no more violators housing unit. No, your honor. When the, uh, that's correct. The, when the policy, the grooming policy changed in June of 2019, um, these, a specific special housing unit, um, for offenders of the policy is no longer part of, of, uh, the department's procedures. And you can see that in the, um, addendum to our brief, uh, which includes the new policy and at, um, the addendum at page five, um, explains how the, it says all offenders that are in the grooming standards violators housing unit, um, shall be transferred out to a suitable institution. Ms. Sam, as you brought up the Greenhill case, um, and I know your first argument is that the, this, uh, claim regarding the grooming policy hasn't been properly preserved, but assuming we get past that and we think that it has been, you can see that I mean, Greenhill, this policy as it existed before you changed it, uh, would in fact, and did in fact impose a substantial burden on Mr. Burke's religion. Um, your honor, we think that that question hasn't, um, wasn't raised before the district court as discussed. And for that reason, we think if that is what the court is inclined to do, that a remand is appropriate to, uh, litigate that question below in, um, the, the way that Greenhill did. Um, so the, we are not prepared to take a position on, on that here because it wasn't, uh, presented to the district court. That's a bit problematic then, because if you say that, then it suggests to me that this claim is not, not moved if you're not willing to concede that point. Well, your honor, we're willing to concede that Greenhill absolutely applies and is absolutely binding. I guess our point is that, that Greenhill, um, it was, you know, its own facts and the district court at Greenhill remanded, um, for, for further evaluation. And so we think that would be the appropriate course here. If the court were to find, um, that the, the grooming policy challenge had been raised. All right, go ahead. Thank you. I think, um, it might be helpful, your honors, the time we have left to discuss the claims that were presented below in our view, um, the, the. Relief on first amendment claims as applied to the religious services items, um, and holiday meals. Um, the district court properly found that Mr. Burke had failed to show that these defendants imposed a substantial burden on his faith. Um, the undisputed evidence shows that the defendants did not, in fact, deny Mr. Burke access to the items that he identified. Um, instead he, he didn't submit the proper requests and comply with the proper policies. And I think it's important to know your honors that this is, this is not just a matter of paperwork or, um, you know, needing to shuffle papers to get what Mr. Burke needs, but these policies are important and have important penological ends and justifications. And, um, that they also work. I think it's, if you look at, um, to take just one example, the list of approved religious items, which there's an example of the list that JA 277. Um, you can see there are several items that are available. And if you look at JA 279, you can see where a new item, the native American drum was added. And it has the date that it was added. And so the idea that, that Mr. Burke was just getting stonewalled at every turn, um, is inconsistent with the record, um, because the, there is evidence in this record and defendants have pointed to it, that there are processes in place, um, for the purposes of preserving prison security, prison safety, inmate and staff safety, um, that, that inmates need to comply with. And that, um, those, those policies are meant to balance these goals and to make sure that VDOT can facilitate inmates religious practice while also balancing these other important, um, important considerations. And so, um, the, the question here is whether Mr. Burke was denied access to those claims. And, and in response, he points to a, um, form that he submitted, which is at JA 40 is the religious services form and VDOT's response is there's, there's no hearing because all you need to do is enroll. And, um, there's an enrollment form. There was an open enrollment period provided, um, every quarter where you could change your enrollment, um, or take yourself off of a list. And it's, it's easy to understand your honors. Why in the context, uh, the unique institutional context of a prison that the prison officials would need to know who was signed up to go to which services, um, and that, that asking Mr. Burke to complete that form, um, is not a, not a substantial burden. And at no point has Mr. Burke either presented evidence or pointed to evidence that, that he did submit the proper forms. Um, I think that that's important to note, uh, what, what he's arguing. Uh, my friend on the other side this morning said that the suggested there was no form, uh, to, to, uh, request approval of a religious object. Um, that is in the record at JA 426. We have no evidence that Mr. Burke did ever submit that. And so, um, you know, while it can be, we understand the frustration in terms of, um, trying to comply with these policies, but, um, the evidence in the record shows that it was clear what Mr. Burke was, was needed to do to access these things. Um, and that there's no evidence that he did. And on that record evidence, um, that there's no finding of a substantial burden on these claims. Turning to the equal protection piece of things, um, in the briefing and here this morning, counsel concedes that the grooming policy and the procedures for acquiring religious services and religious items applied to all offenders equally. Um, they didn't single out any one group. They didn't single out, um, any particular religion. They applied across the board to all, all offenders, uh, at the department. Um, counsel points to the, the form, um, J two 74, that knows Ross the front ends must follow the OC grooming standard. Um, I'll just note your honor. This, this form is first of all, not part of the grooming policy. It's part of the religious, it's an attachment to the, um, the religious programs operating procedure. Um, so it of course can't change or doesn't change the grooming policy, but more importantly, nothing about this form or the parenthetical to which counsel points notes that Ross the front ends are the only ones who have to comply with the grooming policy. Um, I think it's better understood as, um, a note that by being on this list of religions that are approved to meet that in no way excludes or exempt, uh, Ross the front ends or any other religion from the otherwise generally applicable, uh, grooming policy that existed. Um, if there are no further questions, your honor, I believe, ask that this court affirmed the district court's award of summary judgment as to both the free exercise claims and the equal protection claims. Thank you. Thank you. Ms. Samuel, Mr. Hulawa. Thank you, your honors. So I just want to make very clear that Mr. and I will, I want to read directly from his complaint. So if you look at the prayer for relief, um, which is on J 24 paragraph three, Mr. Brooks, the six weeks request. And I quote a declaration that the acts and omissions of the Virginia department of correction, the grooming policy of the operation of 86, 4.1 as applied to plaintiff is in direct violation of his roster farm religious rights under the religious land use and institutionalized persons act and the first amendment free exercise clause. So there he is expressly saying that this grooming policy, um, violated his first amendment and the loop. Right. And then if you look at J 2 83, again, Mr. Burke expressly argued that he was being punished for his religious practice. And I, again, I'll briefly quote, um, according to the 86, 4.1 operating procedure, the violator housing unit was designated to be at Walden's Ridge to discourage inmates from growing hair longer than length allowed in the policy. Um, this prohibited plaintiff from being employed in the kitchen, laundry services. Plaintiff grows his hair as necessary for his religion. Therefore, defendants are punishing the plaintiff, um, for being religious. So Mr. Burke makes very clear that he, that the operation of this policy and the, um, creation of the VHU was punishment for him exercising his religious beliefs, which is most certainly a substantial burden. Uh, now what I think my friends sit on the other side is telling of why this case is a moot. Um, so it's not enough for VDOC just to say that it, I think the words were disclaimed any intention. Um, what this court's cases say is that you have to consider yourself prohibited from returning to this policy to establish movement. And clearly that's not the case. Um, opposing counsel didn't say that, um, VDOC recognizes that this policy places substantial burden on Mr. Burke, so it would never go back to it, which is what would be needed. Um, to prove mootness because as this court said, and while be weighed unsubstantiated appellate promises aside, we have previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's case should not be dismissed as moot. Um, so I think, uh, the, the Virginia Department of Corrections hasn't met a heavy burden of proving mootness here. And so therefore this court should address, um, the RLUPA claim as well. Um, in terms of the religious items and kind of the singling out of I just think it is the least plausible reading of that document to say that this wasn't any kind of, um, uh, affixing upon Rastafarian inmates is kind of special specialized attention or kind of a specialized focus for this grooming policy. It just doesn't make sense. Given the fact that, um, some Jewish sects have to grow their hair, some native American religions require hair growth, some, uh, Muslim sects require growth of beard. There are so many religions that require, um, hair growth or that could run afoul of the grooming policy. And so the fact that VDOC singles out Rastafarians just doesn't pass the smell test. And in fact, as judge Kaiser said, the whole violators housing unit, in his word, uh, was designed to, uh, house people who could not cut their dreadlocks in violation of their religious beliefs. Um, and that is specifically targeted towards Rastafarians. Um, regarding the request for religious services, I think it's really important to note at JA 345 that Mr. Burke was ineligible for group related services by virtue of the fact that he was in the VHU. Um, so it's simply not the case that he didn't fill out the right form. And in fact, Virginia VDOC policies banned him from religious services. And I think it's telling the fact that Mr. Burke requested items over and over again, through all different mechanisms and channels. And not once did a single person in the Virginia department of corrections tell Mr. Burke that you filled out the wrong form or that you need to fill out this form. And instead he wasn't back stonewalled. And I think given the breadth of other objects that VDOC has for other religions, I actually think that works against the prison in this instance, because it does show that efforts weren't made to allow Rastafarian inmates to practice their religion, uh, in the same way that other religions were allowed to practice. Mr. Wallen, can you tell us how many, uh, Rastafarians are in the, uh, Virginia prison system? Uh, your honor, I don't know the exact number, but I do know based on the affidavits that Mr. Burke submitted just in the suit that there are at least seven, um, in Wallenbridge at the time he submitted his complaint, uh, with the attached affidavit. Um, and I think the fact that, uh, the prison created a whole unit, uh, for Rastafarian inmates shows there was a substantial population, um, which really quickly going to another point, Virginia policy, it's known policy states that if there are more than five people of a religion, then there's a presumption that they will be provided group services. And again, for whatever reason, the prison didn't abide by that policy when it came to Rastafarian inmates. So I think there's just too much on this record, um, that goes to show that Rastafarians weren't allowed to fully practice their religion. And in fact, we're punished, uh, through the use of solitary confinement, um, for practicing the religion that if they were, their religious practice was certainly burdened substantially about the prison policies. And in fact, there's enough here, uh, two ways that equal protection clause claims, such as summary judgment at this juncture was inappropriate. Um, now trial may turn out something different, but I think at this stage, this court should reverse the district court. Thank you. Very good. Thank you. Uh, and, uh, Mr. Huala, uh, your court assigned, and I want to, uh, express the appreciation of our court, not just for you, but for the law students that worked with you and assisted you with this case. Um, thank you. I really appreciate it. Thank you. Does Gregory be proud of you, sir? I'm going to, I'm going to quote that judge. Madam clerk. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Robert B. King, Albert Diaz, Stephanie A. Gallagher